Good morning. We're going a little out of order this morning, and hopefully Council for Black v. Montgomery County No. 153399 is up. I guess I'm right. We'll hear from you first. Are we reserving any time for rebuttals? Two minutes, Your Honor. Okay, that's granted. Let me know if this is too close to me. As close as we can hear you. May it please the Court, my name is Michael Schwartz, and with my partner, Jonathan James, we represent Michelle Owen Black, the appellant, who is present today. This case is about whether Ms. Black, who was charged with and stood trial for an arson that did not take place and was the victim of fabrications and spoliation of evidence, had her 14th Amendment due process rights violated any less because she was acquitted than if she had been convicted. Does our prior case law prohibit us from coming out and saying that an acquittal, you still can proceed with this matter even with an acquittal? No. Do we have to undo any of our prior case law in order to get to that? I don't think you have to undo it. It's a matter of just taking it to its logical conclusion. There is much language in Halsey, which is I believe the case to which you're referring, that talks about putting sort of a damper on litigation concerning cases outside of cases that resulted in a conviction. However, when you read the case in its totality, there is so much language about the principles involved that there is no way that one can conclude that Halsey stands for the proposition that only when there is a conviction is one's due process rights violated. But didn't we go out of our way, we limited the holding to persons who were convicted and then specifically stated that courts in the circuit should not permit a criminal defendant who later brings a civil action against state actors who have been involved in this prosecution to use this opinion beyond the scope of our holding? Well, the court said that its ruling was confined to cases where there was a conviction. And when you read further about what the rationale is behind the admonition for litigants not to use this as a tool, it really goes to cases where there are really not issues of fabrication but issues of credibility. Well, let me ask you then, if conviction, let's leave aside, I mean obviously there wasn't a conviction here, there was an acquittal, what would your threshold be? Being charged? Yes. Becoming a subject of an investigation? Where do we draw the line in terms of use of fabricated evidence? We note, however, that if fabricated evidence is used as a basis for a criminal charge, not conviction but a criminal charge, that would not have been filed without its use. The defendant certainly has suffered an injury. Your adversary suggests that predicating your procedural due process claim on a charge is waived, that that's not a theory that was presented in the complaint that was presented to the district court and is expressly relied upon for the first time on appeal, that is, the charging decision as opposed to the trial itself. What's your response to that? I don't believe there's any waiver issues here, Your Honor, because that issue was not addressed in the lower court. What about in your complaint? Isn't the complaint by its terms focused on the use of fabricated evidence at trial rather than, for example, presented to a grand jury or that resulted in actual charges being filed for trial? Now we're at sort of a second issue as to whether the basis of our claim is based upon trial testimony. Just getting back to the first issue. My question is focused on whether you raised a theory of the violation being based on charges versus use of fabricated evidence at trial. Our theory is that the use of fabricated evidence that brought her to trial was a violation of the 14th Amendment due process rights. The testimony at trial is not the basis for any of our claims. I don't know if that answers your question. Well, I understand that's a separate issue in terms of whether there's other evidence on which you rely, but your answer is that you believe the complaint and the arguments presented to the district court related to the entirety of charging through the use at trial. Yes, and the issue about conviction versus acquittal was never raised in the lower court. That was addressed correspondingly by the court in its opinion. The Second Circuit and Rischutti, if I'm pronouncing it correctly, seem to cabin a broad application of what you would like us to do. Would you suggest if we were to find that your view had merit here that we ought to move in the same direction? Absolutely. And I think the Cole case that was cited in our brief, which also does a capsulization of the case law in the various circuits, clearly identifies the same principles that this court and Halsey adopted. I don't think the court intended to engage that. Let's say we were prepared to extend Halsey to this context. That would be new law in our circuit, right? It would be an expansion of existing law. So in light of that, and that other circuits have taken different positions, when we're confronting a claim of qualified immunity, how could we conclude that the law was clearly established? Well, the law that governs behavior, as far as causes of action or legal claims, is not the law that we look to when we determine whether or not there's clearly established conduct that is unlawful. I mean, we have jurisprudence going back 40 years, 70 years, in some cases, that use of fabricated evidence or perjured evidence is a violation of due process. Withholding exculpatory evidence is a violation of due process. But here the claim specifically is procedural due process, that is, its use at least trial, if not also charging. We don't say that we, in looking to qualified immunity elements, we ask whether there was a violation of constitutional right and whether that was clearly established. The constitutional right in question needs to be the one that's at issue in the case, not that some other right was violated. So are we looking here at the scope of the procedural due process right? If that's new, if we're expanding Halsey to get there, then how is it clearly established for qualified immunity purposes? Because the underlying conduct has been the subject of litigation and jurisprudence for, like I say, 40 to 70 years in terms of fabricating evidence as far as framing people. The unlawful nature of that conduct is well-established through Brady, through Malloy versus Holloran, through Agers and Napiew and that line of cases. We've always put a line, drawn a line in the sand of using fabrication and framing criminal defendants as a violation of due process. The issue in this case is whether or not it extends that well-established law, extends for purposes of making it a legal cause of action, extends to cases where it is an acquittal. But then you get into some trouble with Brady claims, don't you? If you use that as an analogy, there's case law saying that an acquittal is not enough to give you cause of action on a Brady claim. Well, I'm just using the notion of the withholding of evidence, the fabrication of evidence, the spoiliation of evidence all give rise to due process claims. I understand. Is this something that we should decide if we think your view, your basic premise is correct? Or is this a matter that goes back to the district court? I think this court can decide whether the claim of action is viable. No, I'm talking about the immunity issue. Oh, the immunity issue I would think would have to go back to the district court since we haven't developed any record as far as what these officers knew and what they didn't know. We're still at the motion to dismiss stage where the standard is whether or not we've made out a plausible case of a due process violation. If the question is whether the law is clearly established, that's something that we can look at. That's a question of law. Absolutely. Let me ask you a question, counsel. In Halsey, we said that the fabricated evidence claim there must have a reasonable likelihood that there would have been no conviction absent the fabricated evidence. So I guess if we adopt your position to allow a fabricated evidence claim when the individual is acquitted, how would the reasonable likelihood standard work into our analysis, if at all? Well, I still think the court has to look at what the underlying allegation of fabrication is. If the allegation is that something trivial, then clearly it wouldn't meet that standard. But in this case, where there is a borderline case for that there was probable cause that an arson was even committed, let alone that Ms. Black committed it. Well, we're going to have to write on this, so we're probably going to have to lay out a standard. There's a standard for when there's an acquittal, I mean a conviction. Well, I think it's also got to be factually based, and of course we haven't been able to develop a factual basis for it. I think that might be the basis for a remand, so that we can then engage in discovery. But don't we need to at least tell them what a standard to apply would be? Well, I think the standard is announced in Halsey, and the other cases that are cited in the Cole case, in terms of... So how does, if there was a reasonable likelihood that there would be no charge, does that work? Yes. Without the fabricated evidence? I think so. If we turn to the issue of seizure... I'm sorry, doesn't that take, and then we have a very different standard, almost the opposite assumption as we do where there's been a conviction. I mean, for consistency in application, doesn't it need to be, if we were to proceed this way, a reasonable likelihood of leading to a conviction, whether it actually does or not, being a separate question? But why would we have a different articulation of the standard, depending on what the outcome is? Well, when we talk about what is probable cause to initiate a prosecution, without the fabricated evidence, if there was no probable cause, and that's somewhat a fluid notion of what probable cause is. More likely than not, it's a fairly low standard. I think that a reasonable likelihood that the prosecution would not have been initiated without this fabrication is just the flip side of addressing the probable cause issue. We'll give you an extra minute to talk about your seizure claim, because you took all your time with the other. Okay, thank you. I'll try to be brief. It's time to go back to reading Gallo and its endorsement of Justice Ginsburg's concurrence in Albright to look at the fact that attending court hearings, including a trial, including arraignment, including preliminary hearings, is something that the court must consider in terms of whether there is a Fourth Amendment seizure. Can you address for us, because in Gallo and as articulated by the Eleventh Circuit in Kingsland, it appears that the restriction on the fundamental right to travel had informed our decision, and it was dispositive for the Eleventh Circuit. We don't have in the appendix here an actual bail bond. Can you shed any further light on the terms of this? This was a personal cousin's bond, $50,000. Any surrender of passport? Any agreement on only travel between California and the court in states as necessary in between? Any of that sort of standard language that sometimes appears in bonds? No. There was nothing that would have informed Ms. Black that she couldn't travel to any of the locations. What it did say was that she had to appear for her court proceedings under threat of bench warrant being issued if she failed to appear. So what do we do with the fact that with Dabella, we've said that simply having to show up, simply making appearances at least a relatively few number of times, isn't sufficient for a seizure? I think we have to go back to Justice Albright's concurrence as adopted by this court in Gallo, in Johnson v. Knorr, and in Schneider v. Smith, and look at the actual language. And the actual language in terms of when the Gallo court addressed the issue of whether or not the fact that Gallo was free to travel within his own state, and obviously within the state of Pennsylvania as well, the court said that he was also compelled to attend all court hearings. An individual detained briefly by police, even if frisked in the process, may be viewed as suffering no greater deprivation of liberty than an individual like Gallo, whose liberty was, and this is important, restrained through travel restrictions and mandatory appearances over an eight-and-a-half-month period. And what has gotten lost in the jurisprudence that has stemmed from Dabella is the whole notion of court appearances. Dabella itself, I don't believe, says that court appearances are never to be considered. I think in that case, it did, because they were municipal court appearances, and the charges were minor, and the travel was local. So I think there is room to go back and look, because throughout it, and the attendant stress and economic loss and reputation and the anxiety of dealing with a criminal case hanging over your head that can result in state incarceration were all factors that Justice Ginsburg recognized, and I believe that this court adopted. I just think we have gotten, in terms of some of the cases which I referred to in my brief as quirky, have gotten away from analyzing. The travel part is problematic, in my view. I mean, what if Ms. Black lived in Australia and was coming back and forth? Should that make a difference, or should it, rather than living in New Jersey? Well, I think it does make a difference, because if you have a right to travel, I think the flip side is that you have a right not to travel. But she didn't have that right not to travel. She had to come to Pennsylvania and did so on at least 14 or 15 occasions. Okay, thank you, counsel. We'll hear you on rebuttal. Thank you. Good morning, Your Honors. Good morning. Carol Vanderwood. I'll be addressing the Fourth Amendment seizure issue. And I think Your Honors hit the nail on the head when we turned on the issue of the freedom to travel and whether or not there were any restrictions in this regard placed on Ms. Black, and there weren't. And again, while Appellant asked this court to move away from its opinion in Dabella, we think that the district court properly concluded that Dabella controls. And again, the issue is, and we affirmed an unpublished opinion recently in Penber cited in our brief. The court pointed out with respect to pretrial attendance at hearings and the trial itself that the Fourth Amendment is intended to redress the Declaration of Liberty accompanying the prosecution, not the prosecution itself, and looked at the issues of the pretrial hearings and the trial itself and concluded that those actually were part of the prosecution itself. So she'd have done better if she stayed, if she had been in jail, obviously. Pardon? If she had been in jail instead, out on bail, she would be in a different situation legally. Correct. Absolutely. Well, how about what Judge Sirica wisely pointed out? She may have been able to travel, but she was also compelled to travel. Should that work into it? And if she didn't travel to come here, then she would lose her bond. That had significance, right? Well, I mean, it's significant, but the question is whether or not it's constitutionally significant to give rise to a Fourth Amendment seizure. And under this Court's reasoning and Debella and several of its unpublished decisions after applying it, the answer to that is no. Again, the issue is she was free to travel. There were no limitations of the type imposed on the defendant in Gallo, which required, for example, weekly check-ins with pretrial services, posting of an actual bond, a monetary bond, not a release on their own recognizance. How is it really any different in terms of the deprivation of liberty to need to report to court? In fact, that seems even more significant than simply reporting to pretrial services. And here, if we look at the sort of flip side of the travel issue, I mean, this is someone coming from California to the East Coast. That's a trip that, you know, having tried to do it in a single day, almost impossible. That's a two- to three-day trip each time. Two to three days that she was not free to be where she wanted or travel where she wanted. She was required each time, and that was 12 times, to make that relatively long trip across the country. She was, but again, the key is looking at all of the factors and looking at this court's reasoning in Dabella and distinguishing it from Gallo and looking at the issue of travel and the issue is whether or not her travel was restricted, whether or not she was not allowed to travel outside of the state of Pennsylvania or New Jersey, which is what happened certainly in the Gallo case. And other than having to attend to the pretrial matters themselves, which other circuits have, you know, explained as being benign, and this court has recognized, at least in Dabella, as being part of the prosecution itself, that's really what we have to look at here. And to the extent that this is part of the prosecution itself, these pretrial matters, under Dabella and this court's precedent, it doesn't give rise to a Fourth Amendment seizure. Since Dabella, we have explicitly reaffirmed our adherence to a theory of a continuing seizure, both in Johnson and Schneider, citing to Gallo. Certainly, and appellant again cited to Schneider in support of its position that there is, this court has accepted some form of a continuing seizure. And again, if you look at this court's reasoning in Dabella and you look also at Schneider, which for reasons I can discuss really don't go to the ultimate issue, which is what is a constitutionally significant seizure under the Fourth Amendment. That case didn't address that at all. What that case focused on was whether or not in the case involving a material witness who was incarcerated, or I should say detained, for 54 days pending a trial of a criminal defendant because she had threatened not to attend. The issue there turned on whether or not the Fourth Amendment seizure applied to address a constitutional claim or whether it was a Fourteenth Amendment due process issue. It didn't address, again, the issue before this court today, which is whether or not restrictions on travel, whether or not pre-trial, the scope of pre-trial restrictions rise to the level of a constitutional violation. And again, I think that's where you have to go back to Dabella and look at what this court did there to guide its decision in this matter. If we disagree with you, if we reverse either yours or your colleagues' arguments, don't we have to remand the Monell and conspiracy claims as well? If we disagree with you, that's a big F. Certainly, if there is, I think because the record really wasn't developed on the issue of the Monell claim, and I think this court might have to send it back down, but I think it's clear on well-settled precedent that this doesn't rise to the level of a Fourth Amendment seizure. When we look at the restrictions that are imposed pre-trial, you're focusing on, understandably from your client's position, on the travel issue alone, but we haven't looked to that as the talisman, as perhaps the Redmond Circuit has. In fact, in Gallo, as your colleague points out in their brief, on close read, that seems to have been an ROR bond. If you look here at the bond itself, here is a $50,000 bond, a personal recognizance bond, and we look at what was imposed in terms of the extent of travel, the number of times, the fact that an arrest warrant was issued, as in Gallo, different from Novella, doesn't that totality suggest that the imposition, the restriction on liberty, was at least as significant as in Gallo? No. And I think you go back to this Court's reasoning again, and I bring it back to Novella. This Court expressly said that Gallo presented a, quote, unquote, close question. This Court didn't adopt an expansive or broad theory of the definition of seizure, and that actually, a broad theory, was expressly rejected by this Court in Novella. And I think if you look at what happened in Gallo versus what happened here, and particularly, and I think significantly, as your Honor pointed out, the lack of any restrictions on travel, there were no restrictions on travel. Again, whether she was required to attend pretrial hearings, which is a matter of the prosecution itself, and this Court has already held doesn't rise to the level of a Fourth Amendment violation, that's a distinct issue, a separate issue from imposing a restriction on her right to travel. None were imposed here. And again, we need to look at Gallo being a close question, Novella not being a close question. And this Court in Novella is saying we have not adopted a broad definition of seizure. That's what appellant is advocating here. The District Court properly declined to adopt a similarly broad approach following this Court's reasoning in Novella, and we'd ask that this Court do the same. It makes me think that maybe the courts took a wrong turn when they decided to deal with this malicious prosecution issue under the Fourth Amendment instead of under the Fourteenth Amendment. Well, that was an issue brought up in Schneider, which is where does the line cross over from the Fourth Amendment to the Fourteenth Amendment? Again, not an issue here. So, thank you, Your Honor. Thank you. Philip Newcomer for the Appellate's Montgomery County. I'm Detective John Fallon, and I will be addressing the Fourteenth Amendment claim for the appellees. The District Court was correct to follow this Court's ruling in Halsey and to refuse Ms. Black's invitation to extend Halsey's recognition of a stand-alone Fourteenth Amendment claim to a situation where a criminal defendant was acquitted at trial. The Halsey Court recognized a relatively circumscribed cause of action for individuals who suffered tainted convictions and unjustly imposed punishment on the basis of factually indebted. Counsel, I mean, didn't Halsey kind of tee this up for us to maybe recognize this right? I mean, a lot of the opinion was talking about corruption at the trial process, not necessarily the result. How do you square that away? Well, Halsey certainly did leave open for another day a situation where there was an acquittal. But in teeing it up, the Halsey Court specifically formed this reasonable likelihood standard that the Court mentioned earlier. And that standard is very important here because what that standard teaches us is that not every use of fabricated evidence is necessarily going to resolve in a stand-alone due process claim. But that doesn't require that there actually have been a conviction to make an evaluation of how much this contributed. Isn't the formulation of that test simply a way to assess the materiality of the evidence, whether or not it resulted in a conviction or acquittal or a mistrial? Yes, but in this circumstance, we do know because of the acquittal that the allegedly fabricated evidence was not so significant as to affect the outcome of the trial. That's a dryball conclusion. I mean, juries reach their decisions for a variety of reasons. It's a motion to dismiss. Well, it's a motion to dismiss on a very detailed complaint, which alleges, among other things, that the jury deliberated less than 40 minutes before returning their verdict. We went out of our way in footnote 20 in Halsey to make the point that we are not suggesting that there's nothing wrong with fabricating evidence if it does not affect the final verdict. And we weren't deciding there about what discipline might be appropriate for officers who correctly try to change the outcome of a case but fail, either because the jury returns a not guilty verdict or it wouldn't return a guilty verdict even without the fabricated evidence. That's absolutely true, and I'm not suggesting that there's nothing wrong with that either. What I am saying is that the reasonable likelihood standard must be applied. At what stage, though? The charging stage? Well, it's interesting, Your Honor, to bring that up. I think it would have to be consistently applied. But what's very important in this particular case is that this is not a charging case. It's not pled as one. If you look at the complaint, the full affidavit of probable cause is recited in the complaint, and it's recited at pages A43 to 45 of the record. The alleged fabrications that are the basis for this 14th Amendment claim here are threefold. The first is a spoliation issue. Whether a deputy fire marshal, by failing to preserve the components of an outlet, created an issue because the plaintiff's expert, the criminal defendant's expert at trial, later identified that outlet as the source of the fire. The deputy fire marshal had taken numerous photos of it, and the plaintiff's expert from those photos was able to opine that the outlet was the source of the fire. It was not an issue that was difficult for the jury to deal with, obviously, at trial. The second was that the same deputy fire marshal at trial testified falsely that the wire to that outlet had been cut before the fire. And, again, there was evidence in the record, photographs of the wall opened up after the fire, showing the wire connected. So there was clear evidence on the record that the jury could look at to disregard that testimony. There certainly are allegations about the use at trial. I take your point, but the complaint also can be read in at least paragraphs 64 and 65 to suggest that an issue is using the repudiated negative corpus methodology, an exercise in building a case against plaintiff, which seems like it could encompass the charging decision, the presentation of the charges for indictment or information to be returned, as well as its use at trial. What we're reviewing, really, is the district court's decision, and the district court's decision is a matter of law that this right didn't extend to trial because of Halsey. Why do we need to get into the parsing of charging versus trial when what we're really deciding is whether the district court's rationale is one that we agree with or not? Well, I think the district court's rationale is correct, first of all, but I also do think that it doesn't take much parsing to see here that this is not a charging case on these facts that are alleged in the complaint, and this question of methodology, a negative corpus, where they're dealing with a theory and how two competing experts view that and whether this was even applied. That's very different. That's then competing viewpoints, very different than fabrication, and what these 14th Amendment stand-alone claims are when they're recognized is clear instances of fabrication. It's the use of that evidence. Let's step back and think in the big picture of what we're dealing with here. This is a procedural due process claim, a constitutional claim. That relates to the fairness of the process, and that's a fairness that goes to the charging, the return of a charging instrument, as well as a process at trial, doesn't it? I mean, when we think about what the purpose is of this right and whether this should be extended to a situation where there's not a conviction, doesn't it just point out what the interest really is, which is ensuring fairness of process regardless of the outcome? I think that is the underlying interest, but I think if that is then extended to the point where two experts are conflicting about what something is, then it's just gone too far. Okay. May it please the Court. I'm Claudia Tesor. I'm from the Attorney General's Office, and I'm here on behalf of Trooper Robert Pomponio, who was the last one to arrive at the House, as you know, and who has only been sued for conspiracy. I think the issues in the Fourth and 14th Amendment have been pretty thoroughly discussed already, and the limited time that I have,  to Trooper Pomponio, and I'll be very quick on those. First of all, a conspiracy claim requires certain pleading standards. It must meet certain pleading standards just like anything else, of course, but I draw the Court's attention to the Great Western case, which specifically dealt with a civil rights conspiracy and made the determination that the facts have to plausibly suggest a meeting of the minds for an unlawful purpose. The time the conspiracy was entered, the parties to the conspiracy, the period over which the conspiracy extended, and the object of the conspiracy. Now, the district court didn't really pass on what you're arguing right now, right? I mean, they pretty much, based on the Court's ruling on the first two issues, said we basically punted on this issue and said we don't need to get there. The district court did not rule on it. These points were raised and presented to the Court, and the Court decided it wasn't necessary in light of its conclusions. So I understand what you're saying about that, but because the records... And you're entitled to advance any arguments you want to support and affirm it. Okay, well, that's exactly what I'm trying to do for my client, and it may or may not affect the other parties to the case. And I assume that behind that is the interest that is served by qualified immunity of limiting the burden on public servants, if a case can be knocked out at the qualified immunity stage at the earliest opportunity. That's totally appropriate, and qualified immunity is the second alternative grounds that I was about to speak on. What do we do, though, with the allegation that we do have in the complaint that the trooper tailored his report to comport with defendant hands and defendant felons, despite clear evidence to the contrary? I don't think that allegation that they agreed about the cause of the fire is an allegation of conspiracy, if that's what you're asking. Isn't that inherent in the allegation of tailoring of a report? That is, that term, it incorporates the notion of a knowing and intentional decision. Tailoring does imply something knowing, but it doesn't imply anything wrong. Law enforcement officers are perfectly entitled, I think there's plenty of case law to support the idea, that they may rely on each other for information, they may confer, they may do things as a cooperative group of investigators or police officers or whatever. If every time officers do that, their conscious decision to cooperate with each other becomes a conspiracy, then the allegation here isn't simply reliance, it's tailoring the report to cite clear evidence to the contrary. I think that the clear evidence to the contrary is being described that way because of what happened way later. We have to carry ourselves back to the day when the fire occurred, and the evidence that existed then, and what was seen then and analyzed then. But those sound like factual disputes that would need to be worked out, as opposed to whether on the face of the complaint, in terms of the allegations, there's enough to inform a conspiracy. I can only repeat that I think just the complaint, if you look at the paragraphs that concern what Trooper Pompano did, and they're paragraphs 37 through 45, it just tells us that he didn't have a tremendous amount of experience, he came when called, he walked in, did a quick review, was told about the wires having been cut, and he would normally go to the basement but he chose not to because he was told that that had already been checked out. And then paragraph 45 is where the word tailoring of the report is mentioned, but I don't think that that tailoring of a report to comport with everything that was seen on the day in question can be interpreted as anything illicit. I sort of see the complaint as alleging that Pompano should have conducted a more diligent investigation, he just should not have accepted Han's version of the facts. I can understand why Ms. Black and her counsel assert that. I don't think that's sufficient, but there may be factual issues with respect to this. I think it's, to me it's the weakest part of the claim the plaintiff has made here. Well, the fact is that unlike some cases, the plaintiff knew of a tremendous amount going in because she had already been through the entire criminal process. If she had information that could have made more explicit and more colorable allegations against Trooper Pompano or anyone else for that matter, having had not one, not two, but three chances to do so, I'm sure she would have. But we're still on the pleading stage. I think that's your problem here. Well, it is true that it's the pleading stage. I can't possibly refute that statement. But I think at the pleading stage, either on the basis of the weak allegations of conspiracy or on qualified immunity, which I don't have time to address because my light is on, but I would strongly urge that the discussion we heard earlier this morning reflects just how unsettled the law is in this entire situation. And for that reason, qualified immunity would be appropriate. It is the case, and even considering what came out at trial, there's not here the benefit of, for example, deposition testimony that would be taken in discovery about what conversations took place between the trooper and other fire officials or law enforcement officials at the scene. If there were exchanges that might support an agreement or support the notion of tailoring in the absence of clear evidence to the contrary, for example. Ms. Beck sought and was granted leave to supplement the appendix with three pages, I believe it is, of trial testimony that was recorded at the trial. I haven't seen the whole trial, but that doesn't contain the proverbial smoking gun about any kind of agreement or anything else, as I read it. The court, of course, will read it and make its own assessment. Thank you, counsel. Thank you. I'll be very brief. Can you address where we left things off? Where is there really an allegation about a meeting of the minds as needed for a conspiracy charge? Well, in the reply brief, I did append a few pages from Appellee Hand's testimony at trial where they described meeting together and coming up with a conclusion at the scene very soon after they all arrived and came together that there was an arson here. This was incendiary. This had an accidental cause. When you look at then the efforts made to prove that through fabrications, as we have alleged, and through the spoliation of potentially exculpatory evidence, as we will hope to prove when we get past the pleading stage, then there's an inference that they all joined in the same conduct to come up. But this isn't summary judgment. I recognize you've attached some testimony from trial, but for these purposes, don't we need to look what's on the face of the complaint? Have you alleged a meeting of the minds that would support this coming forward as a conspiracy charge involving this individual defendant? Well, I think what we've done is shown that Fallon has incorporated Pomponio in every facet of his investigation, certainly in the context of the affidavit of probable cause where he refers to himself and Pomponio as experts in fire detection and referred to them as having done an exhaustive investigation into this matter, where Pomponio wrote his own report that I think I described at one point as being sort of lesser included of Fallon's report. So there was a submergence. And I'll be frank. It's obviously the weakest part of the link here, conspiracy. But as this court has said, and I cited in the brief, that we should be reluctant to dismiss conspiracy cases at the pleading stage when there's so much that needs to be developed. We have, I believe, in the context of this case, given the conduct of all five members who interrogated Ms. Black, who wrote reports about this case, that we have sort of nudged the possibility of conspiracy into the plausibility area that should allow us to engage in discovery. Okay. Thank you, counsel. Thank you. We thank counsel for their excellent briefing and argument.